741 So.2d 1057 (1999)
John R. WILLIAMSON
v.
INDIANAPOLIS LIFE INSURANCE COMPANY et al.
1970998.
Supreme Court of Alabama.
July 30, 1999.
*1058 W. Lee Pittman of Pittman, Hooks, Dutton & Hollis, P.C., Birmingham, for plaintiff.
Cathy S. Wright and Lorrie L. Hargrove of Maynard, Cooper & Gale, P.C., Birmingham; and George E. Purdy of Bose, McKinney & Evans, Indianapolis, Indiana, for defendant Indianapolis Life Insurance Company.
Steve Olen of Olen & Nicholas, P.C., Mobile; and David G. Wirtes, Jr., and George M. Dent III of Cunningham, Bounds, Yance, Crowder & Brown, Mobile, for amicus curiae Alabama Trial Lawyers Ass'n, in support of the plaintiff.
Joe R. Whatley of Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, for amicus curiae American Federation of Labor-Congress of Industrial Organizations (AFL-CIO), in support of the plaintiff.
Kathy Smith Campbell of Chestnut, Sanders, Sanders & Pettaway, Selma, for amicus curiae Alabama New South Coalition, Inc., in support of the plaintiff.
James C. King of King, Ivey & Warren, Jasper, for amicus curiae United Mine Workers of America-District 20, in support of the plaintiff.
Corrie Haanschoten, Montgomery, for amicus curiae Alabama Education Ass'n, in support of the plaintiff.
Paul P. Bolus, Gary L. Howard, and Alycia K. Jastrebski of Burr & Forman, L.L.P., Birmingham; and Phillip E. Stano, American Council of Life Insurance, Washington, D.C., for amicus curiae American Council of Life Insurance, in support of the defendants.
Bert S. Nettles, Mark D. Hess, and A. David Fawall of London & Yancey, L.L.C., Birmingham, for amicus curiae State Farm Life Ins. Co., in support of the application for rehearing.
Forrest S. Latta of Pierce, Ledyard, Latta & Wasden, Mobile; Charles A. Stewart III of Sirote & Permutt, Montgomery; and Rhonda Pitts Chambers of Rives & Peterson, Birmingham, for amicus curiae Alabama Defense Lawyers Ass'n, in support of the application for rehearing.

*1059 On Application for Rehearing

MADDOX, Justice.
The opinion of December 4, 1998, in which this Court answered two questions certified to it by a federal court pursuant to Rule 18, Ala. R.App. P., is withdrawn, and the following opinion is substituted therefor.

I. Discussion of the Question Whether Certified Questions Are Subject to Rehearing Applications
The plaintiff, John R. Williamson, relying on Burnham Shoes, Inc. v. West American Ins. Co., 504 So.2d 238 (Ala. 1987), argues that this Court should not grant the application for a rehearing filed by the defendant Indianapolis Life Insurance Company. Williamson argues that, under Burnham Shoes, this Court lacks the power to grant a rehearing in regard to a question certified to this Court pursuant to Rule 18, Ala. R.App. P.
We recognize that in Burnham Shoes, a majority of this Court did strike an application for rehearing directed toward this Court's answer to a certified question. We also recognize that Justice Jones, joined by three other Justices, vigorously dissented from the order striking that application for rehearing. In his dissent, Justice Jones stated:
"It is the office of an application for rehearing to afford the nonprevailing party an opportunity to seek reconsideration by the reviewing court, and to afford the reviewing court one final opportunity to correct any errors in its opinion.
"The federal court, in diversity cases, is interested only in being informed on state law issues, not in having certified questions answered in a particular manner. Only the parties have an interest in how the question is answered. Thus, it is only the parties and their counsel that have an interest in seeking rehearing, and not the court. Then, too, I find no wisdom in this Court's shielding itself from reconsideration of its own opinion. After all, the application for rehearing affords this Court its final opportunity to get it right.
"I find nothing in the certified question procedure that requires us to deviate from our traditional procedure in regard to applications for rehearing."
Burnham Shoes, 504 So.2d at 242 (Jones, J., joined by Torbert, C.J., and Maddox and Adams, JJ., dissenting as to the order striking the application for rehearing).
This Court's action in striking the rehearing application in Burnham Shoes has been taken as establishing a rule that this Court will not or cannot entertain an application for rehearing after it has answered a certified question pursuant to Rule 18, Ala. R.App. P. See, e.g., Roe v. Mobile County Appointment Board, 676 So.2d 1206, 1263-65 (Ala.1995); and Hogan v. State Farm Mutual Automobile Insurance Co., 730 So.2d 1157 (Ala.1998). We find Justice Jones's analysis in Burnham Shoes compelling, and we now adopt it. That rule established by the action in Burnham Shoes is today abrogated, and any cases declaring such a rule are, to that extent, overruled.
We grant Indianapolis Life's application for rehearing of the two certified questions. We note that after this Court issued its opinion on December 4, 1998, answering the two questions, the federal court again certified to this Court the same two questions. That recertification has not been docketed as a separate case in this Court, but as a part of this case no. 1970998. Aside from the question of what effect that recertification otherwise might have had, we consider it moot because of our decision to rehear the two questions.

II. Discussion of the Certified Questions
Judge Robert B. Propst, of the United States District Court for the Northern District of Alabama, certified to this Court in March 1998 two questions, pursuant to Rule 18, Ala. R.App. P., relating to a dispute between an insured and *1060 his insurer over a so-called "vanishing-premium" insurance policy:
"(1) Whether, in light of the fact that any fraud-based cause of action will not survive his death, John Williamson is presently precluded from pursuing fraud-based causes of action because he will not be required to make any out-of-pocket premium payments after 2002 if he dies before [any] 2003 out-of-pocket premium is due.
"(2) Whether John Williamson is presently precluded from pursuing any causes of action against Indianapolis Life on the ground that no damage has occurred because, despite a current projection showing that he will have to make the $92,000 annual out-of-pocket premium payments through 2006, there remains the possibility that no out-of-pocket premium payments will be required after 2002 if he dies before a 2003 out-of-pocket premium payment is due or if Indianapolis Life's dividend scale increases in the next few years and does not decrease after 2002."
The legal issue presented by these questions is whether an insured who purchased a "vanishing-premium" insurance policy is precluded from pursuing fraud-based causes of action, on the basis that if he is required to make out-of-pocket premium payments, he will not be required to do so until some future date and, therefore, has presently suffered no damage.
In 1992, John R. Williamson purchased two whole-life interest-sensitive insurance policies called "Quick Pay Life" policies, from Byrne Abele, an agent of Indianapolis Life Insurance Company. The face amount of the policies totalled $5.5 million.
Williamson sued Indianapolis Life in the United States District Court for the Northern District of Alabama. He alleges that before he purchased the policies, Abele told him that if he made premium payments of approximately $92,000 per year for 10 years, the policies would go into "auto pilot" and the premiums would "vanish" in the year 2002. Technically, however, the premiums on such policies never vanish. The underlying theory of such policies is that the cash value of the policies will generate enough income through dividends and interest to pay the premiums on the policies and the policies will thereby sustain themselves. The ability of such policies to sustain themselves depends on mortality rates, expenses, dividends, and interest rates.
Williamson sued after realizing that he probably would have to pay additional premiums after the 10-year period expires in 2002. Williamson presented evidence indicating that Indianapolis Life knew in 1992, when it sold the policies to him, that the concept of "vanishing premiums" was not viable. Indianapolis Life moved for a summary judgment, arguing that Williamson had sustained no damage and, therefore, could not presently pursue a cause of action based solely on projections suggesting that the policies would not perform as promised. Specifically, Indianapolis Life argued that Williamson cannot sue unless and until he is actually asked to make an out-of-pocket premium payment after the expiration of the 10-year period. Williamson alleges that Indianapolis Life represented that he would not have to pay premiums beyond the year 2002. Although there are projections suggesting that the agent's alleged representation was false, there is absolutely no way to know whether this representation was true or was false, until the end of the year 2002. For example, we must assume that if Williamson dies before the end of 2002, the insurer will pay the benefits called for by the policies and Williamson will have received the full benefit of what he claims to have bargained for. There is no way to prove that he will live beyond the year 2002. The projections Williamson offered as proof of his fraud claims are merely thatprojectionsand we consider them to be speculative. Williamson cannot show, with that degree of specificity the law requires, that the policies will not perform as he alleges he was told they would.
This Court, in addressing a variety of causes of action, has consistently held that *1061 if the plaintiff has suffered no harm, loss, injury, or damage, then the plaintiff has no claim to be adjudicated. See Ford Motor Co. v. Rice, 726 So.2d 626 (Ala.1998) (holding that the owner of a sport-utility vehicle could not maintain an action alleging fraudulent suppression based solely on the risk that her vehicle might roll over because of an alleged defect); Pfizer, Inc. v. Farsian, 682 So.2d 405 (Ala.1996) (holding that one who had received a manufactured heart valve could not recover damages based on speculation that the valve might fail); Luken v. BancBoston Mortgage Corp., 580 So.2d 578 (Ala.1991) (holding that the plaintiffs had no claims presently adjudicable, because the plaintiffs only anticipated being required to make payments in the future); and Smith v. Alabama Dry Dock & Shipbuilding Co., 293 Ala. 644, 309 So.2d 424 (1975) (holding that a corporation was not entitled to a declaratory judgment concerning a retirement plan that might or might not be implemented).
Williamson argues that this case is distinguishable from those cases and is more analogous to Boswell v. Liberty National Life Insurance Co., 643 So.2d 580 (Ala. 1994). In Boswell, this Court held that insureds could maintain fraudulent-misrepresentation and suppression claims based on their allegations that the insurer had persuaded them to surrender one policy and to purchase, for greater premiums, a policy that was represented to provide greater benefits. The basic question in that case was whether, given that the plaintiffs had made no claim under the policy, they had suffered any injury. This Court held:
"The injury or damage alleged is that the plaintiffs were persuaded, through the fraudulent acts of the defendants, to pay for something they did not receive. In other words, the alleged injury or damage was the payment of greater premiums that were unnecessary because the plaintiffs received no additional coverage in return for the greater premiums and lost benefits they already enjoyed under the old policy."
Boswell, 643 So.2d at 582. Williamson argues that his case is similar to Boswell. We are not persuaded that it is.
In Boswell, the plaintiffs were persuaded to purchase something that did not exist and never would exist. In the present case, Williamson purchased policies that will perform as he says he was told they would, if he dies before 2003 or if he does not have to pay premiums on the policies after the year 2002. In other words, because the performance of the policies is directly related to interest rates, Williamson today can only speculate that the policies will not sustain themselves as he claims he was promised.
We conclude that Williamson had suffered no discernible injury when he filed his action; therefore, we answer both of Judge Propst's questions in the affirmative. Courts in other jurisdictions have considered questions similar to the ones Judge Propst has certified to us, and those jurisdictions have similarly held that such a claim as Williamson makes is not ripe for adjudication. See Frith v. Guardian Life Ins. Co., 9 F.Supp.2d 734 (S.D.Tex.1998); Solomon v. Guardian Life Ins. Co., Civ. A. 96-1597 (orders of Dec. 10, 1996, and Sept. 26, 1997, E.D. Pa.) (not published in F.Supp.); Lewis v. Guardian Life Ins. Co., No. 604753-9 (N.Y.Sup.Ct., N.Y.County, Mar. 30, 1998) (not published).
APPLICATION FOR REHEARING GRANTED; OPINION OF DECEMBER 4, 1998, WITHDRAWN; OPINION SUBSTITUTED; QUESTIONS ANSWERED; RECERTIFICATION DEEMED MOOT.
HOOPER, C.J., and HOUSTON, SEE, and BROWN, JJ., concur.
LYONS, J., concurs in part and dissents in part.
COOK and JOHNSTONE, JJ., dissent.
LYONS, Justice (concurring in part and dissenting in part).
I concur in Part I, holding that an answer to a certified question may be subject *1062 to an application for rehearing. See Hogan v. State Farm Mut. Auto. Ins. Co., 730 So.2d 1157 (Ala.1998).
I dissent from Part II, which answers Judge Propst's questions in the affirmative. On December 4, 1998, I concurred in the per curiam opinion answering the questions in the negative. I adhere to the views expressed in that original opinion and, rather than attempt to restate them, I attach the original opinion as an appendix to this special writing.
[Appendix follows the other special writings]
COOK, Justice (dissenting).
I concurred in the opinion of December 4, 1998, that the majority today withdraws. Justice Lyons has attached a copy of that now withdrawn opinion as an appendix to his dissent. Because I agree with the rationale expressed in that opinion of December 4, 1998, I dissent from today's ruling and opinion.
JOHNSTONE, Justice (dissenting).
I respectfully dissent. Like Justice Lyons, I agree with the opinion originally issued by this Court to answer these same certified questions. Justice Lyons has attached the original opinion as an appendix to his special writing, for the convenience of the reader.

APPENDIX TO JUSTICE LYONS'S SPECIAL WRITING

SUPREME COURT OF ALABAMA

OCTOBER TERM, 1998-99

1970998

John R. Williamson

v.

Indianapolis Life Insurance Company et al.

Certified Question from the United States District Court for the Northern District of Alabama, Middle Division (CV-97-PT-0127-M)
PER CURIAM.
In 1992, John R. Williamson was looking for a way to fund two trusts that he was creating. While his personal health was good and his business was thriving, Williamson was willing to make large, up-front payments to fund the trusts. Williamson purchased two whole-life "vanishing-premium" insurance policies called "Quick Pay Life" policies, from Indianapolis Life Insurance Company ("Indianapolis Life"), through its agent, Byrne Abele. The total amount of the policies was $5.5 million.
A vanishing-premium policy is one where, after a certain number of premium payments have been made, the policy itself generates sufficient income through dividends and interest to pay any additional premiums. Stated differently, premiums paid in the initial years of a policy are supposed to pay for premiums in later years, so that future premiums "vanish." How quickly the premiums will vanish depends on several factors, including mortality rates, expenses, dividends, and interest rates.
Williamson claimed that before he purchased the policies, Abele told him that if he made premium payments of approximately $92,000 a year for 10 years, the policies would then go on "auto pilot" and he would not have to make any further premiums in that, based on the 1992 interest rate, dividend structures, and other factors affecting the "vanishing" date at that time, the vanishing would occur in 2002. In actuality, the premiums never vanish. Premiums are due and payable for life. However, if the policy generates enough income, then the premiums are paid from the income. Williamson claimed he believed that the policies would allow him to pay a large sum of money over 10 years to fund the trusts so that he would have no "out-of-pocket" obligations after the 10-year period.
*1063 In December 1996, Williamson sued Indianapolis Life in the United States District Court for the Northern District of Alabama, after realizing that additional premiums would be necessary after the 10-year period expired in 2002. Williamson presented evidence indicating that Indianapolis Life knew in 1992, when it sold the policies, that the concept of "vanishing premiums" was not viable. Indianapolis Life moved for a summary judgment, arguing that Williamson had yet to sustain damage and, therefore, could not presently pursue a cause of action. Specifically, Indianapolis Life argued that Williamson could not sue until he is actually asked to make an out-of-pocket premium payment in 2003 or thereafter.
Judge Robert B. Propst has certified to us the following questions, pursuant to Rule 18, Ala. R.App. P.:
"(1) Whether, in light of the fact that any fraud-based cause of action will not survive his death, John Williamson is presently precluded from pursuing fraud-based causes of action because he will not be required to make any out-of-pocket premium payments after 2002 if he dies before [any] 2003 out-of-pocket premium is due.
"(2) Whether John Williamson is presently precluded from pursuing any causes of action against Indianapolis Life on the ground that no damage has occurred because, despite current projections showing that he will have to make the $92,000 annual out-of-pocket premiums throughout 2006, there remains the possibility that no out-of-pocket premium payments will be required after 2002 if he dies before a 2003 out-of-pocket premium payment is due or if Indianapolis Life's dividend scale increases in the next few years and does not decrease."
In sum, the underlying issues are 1) whether a claim based on a "vanishing-premium" policy is justiciable before the due date of the first out-of-pocket premium payment that is due for a period that is beyond the period for which the insurer represented that premiums would be paid; and 2) whether Williamson's claims are made nonjusticiable by the fact that he has not yet had to pay an out-of-pocket premium for the period beyond the year 2002 and will never have to make such an out-of-pocket payment if he dies before 2003.
There must be a bona fide existing controversy of a justiciable character to confer jurisdiction upon a court. Smith v. Alabama Dry Dock & Shipbuilding Co., 293 Ala. 644, 309 So.2d 424 (1975). In Smith, a corporation sought a declaratory judgment upholding the validity of a proposed retirement plan. In its complaint, the corporation stated that the plan "will or may be" contested. This Court held that there was no justiciable controversy. First, the minority shareholders that the corporation anticipated would contest the plan formally declared that they would not pursue a legal challenge to the adoption of the plan. Second, the retirement plan was not in effect and was not going to be put into operation without court approval. In fact, there was no retirement plan in effect for a court to declare valid or invalid. This present case is different in that it involves two insurance policies that are presently in effect.
In Luken v. BancBoston Mortgage Corp., 580 So.2d 578 (Ala.1991), the Lukens purchased a house, financing the purchase by a mortgage loan from Banc-Boston Mortgage Corporation that was partially guaranteed by the Veterans Administration. The Lukens sold the house to Leps, who assumed the mortgage, but the Lukens remained liable if Leps defaulted *1064 on the loan. The house was damaged in a fire, and Allstate Insurance Company, which had insured it, issued a check to BancBoston and Leps jointly. Pursuant to the mortgage, BancBoston had the option either to apply the insurance proceeds to reduce the indebtedness or to repair the house. BancBoston gave Leps $7,500 to pay for repairs, and it applied the rest of the money toward the debt. Leps asked for more money and BancBoston refused because Leps had misused the $7,500. Leps abandoned the house. The house was sold at a foreclosure sale. Approximately $8,000 remained on the loan.
The Lukens asked the VA to excuse them from liability for the $8,000 deficiency. The VA denied the Lukens' initial request. The Lukens then perfected an administrative appeal of the denial. Before an administrative decision was reached, the Lukens sued BancBoston. We affirmed the trial court's holding that the matter was not yet ripe for a judicial resolution. At the time when the Lukens sued BancBoston, it was uncertain whether the Lukens would be required to pay the deficiency at all.
Indianapolis Life argues that Luken is analogous to the vanishing-premium situation. However, the Lukens would not be harmed if they waited for a decision from the VA in their administrative appeal. A favorable decision by the VA would alleviate the need to sue BancBoston, because the Lukens were suing BancBoston to make it pay the deficiency they claimed it created when it wrongfully gave Leps the $7,500. In contrast, Williamson has suffered harm by paying the first several years' premiums on the vanishing-premium policies. Williamson alleges that but for Indianapolis Life's misrepresentations, he would not have purchased the policies.
In arguing that Williamson's claims are not presently justiciable, Indianapolis Life also relies on Pfizer, Inc. v. Farsian, 682 So.2d 405 (Ala.1996). In Pfizer, we agreed to answer the following certified question:
"Does a heart valve implantee have a valid cause of action for fraud under Alabama law if he asserts that the valve's manufacturer fraudulently induced him to have the valve implanted when the damages that he asserts do not include an injury-producing malfunction of the product because the valve has been and is working properly?"
682 So.2d at 406.
Farsian opted to use a valve made by Pfizer rather than to use a heart valve from a pig. Farsian learned of potential problems with the Pfizer valves that had resulted in deaths. Farsian sued Pfizer, alleging fraud, and seeking mental-anguish damages and payment of the cost of an operation to replace the valve. When he sued, Farsian's valve was working properly. Pfizer argued that the case was a products-liability action; Farsian argued that his cause of action was fraud and was outside the scope of products-liability law. We held that "[r]egardless of how Farsian pleads his claim, his claim is in substance a product liability/personal-injury claim Farsian seeks damages because of the risk that his heart valve may one day fail." 682 So.2d at 407. In that case, Pfizer did not admit that representations it had made regarding the heart valves might have been untrue. In this case, however, Indianapolis Life has acknowledged the possibility that representations made by one of its agents concerning the vanishing-premium policies might have been untrue.
We conclude that Williamson's claim is not analogous to the claim presented in a products-liability/personal-injury case, but it analogous to the claim presented in Boswell *1065 v. Liberty National Life Insurance Co., 643 So.2d 580 (Ala.1994). In Boswell, the plaintiffs had been induced to switch their cancer insurance policies for a newer kind of policy. The insurance agents told the plaintiffs that although the new policies would cost more, they would provide more coverage and additional benefits. The plaintiffs alleged that in fact the new policies not only cost more, but offered less coverage than the old ones. The question before the Court was whether the plaintiffs' allegation that they had suffered a cognizable injury merely from the exchange of the policies was sufficient to state a claim, even though no plaintiff had ever filed a claim either under one of the old policies or under one of the new policies. We held that the payment of insurance premiums was sufficient to support the plaintiffs' claim that they had been damaged as a proximate result of the insurer's misrepresentations. Although the Court in Boswell sometimes spoke of plaintiffs' injury or damage as being the payment of unnecessary premiums, the reasoning behind its decision is that a person who is induced by fraud to purchase an insurance policy that is materially different from what the policy was represented to be, has suffered damage by paying premiums on the policy:
"When a person, such as Wilhemena Boswell in this case, buys cancer insurance, she hopes that she will never have to `use' it. That does not mean that she cannot be injured by the loss of, or a reduction in, those benefits that could be claimed, should that very event against which she sought to be insured ever occur and she was forced to `use' the policy. An insurer has already weighed the risk that that event will occur and has contractually expressed its willingness to take that risk for a price, i.e., the premium. The contractual agreement between the insurer and the insured should be a fair and open transactiona suitable price for an appropriate service. However, when an insurer disturbs this negotiated balance, through fraudulent misrepresentation or fraudulent suppression of material facts, the insured should be allowed to recover in order to counterbalance the damage or injury thereby done to her. Make no mistake, even if the insured files no claim, the loss of what the insured paid for constitutes legal damage or a legal injury. The insurer cannot be allowed to profit from its fraud simply because the insured is `lucky' enough never to have to `use' the coverage."
643 So.2d at 582.
We find persuasive Myers v. Guardian Life Insurance Co., 5 F.Supp.2d 423 (N.D.Miss.1998). In Myers, Guardian Life Insurance Company sold the plaintiff vanishing-premium policies. The plaintiff, on behalf of a class, sued, alleging, among other things, fraud. Specifically, the plaintiff alleged:
"Contrary to Guardian's express representations at the time of sale, the Policies' premiums would not in fact `vanish' on the date promised, and plaintiff and the Class would be required to pay additional out-of-pocket premiums beyond those shown at the time of sale. In sum, Guardian knowingly and recklessly manipulated its vanishing premium Policy illustrations to artificially enhance the illustrated Policy performance through a variety of insupportable assumptions and actuarial devices."
5 F.Supp.2d at 426. Guardian moved to dismiss the action, arguing that the plaintiff's claims were not "ripe" for adjudication, because, Guardian argued, they concerned *1066 uncertain and contingent future events. The court stated that the harm alleged was "neither speculative nor contingent." The court continued:
"It is actual harm which [the plaintiff] allegedly suffered when he bought the policy in 1988. Specifically, the harm is purchasing the policy itself. That is, but for the allegedly actionable behavior of Guardian, [the plaintiff] would not have purchased the policy in the first place, or at least he would not have paid the price Guardian charged."
5 F.Supp.2d at 429.
Williamson relied on a world of certainty when he decided to purchase a vanishing-premium policy; he did not get what he bargained forIndianapolis Life has conceded that Williamson is living in a world of maybe. We conclude that Williamson has stated a presently valid claim that he was damaged by not receiving the insurance product that was represented to him. Williamson has presented evidence indicating that the promise that he would have no payments past 2002 was unfulfillable when it was made in 1992. Williamson is not precluded from suing Indianapolis Life, because his having already paid premiums on the policies is sufficient to support a finding that he has been damaged. The questions are answered in the negative.
CERTIFIED QUESTIONS ANSWERED.